May it please the Court, my name is Jonathan Montag, and I represent Mr. Enrique Gervacio-Lucas. Mr. Gervacio came to the United States border after fleeing from Guatemala because of a kidnapping that occurred to him, which he asserted was by the police, and his wife was told also that the police were involved in the whole scene. So they knocked on the door and they said, it's the police, and then when he opens the door it was clear it wasn't the police, that it was just a ruse to get in the door, right? That was his testimony. The fact that it was a ruse is not as clear as the fact that he did say in his testimony that they weren't police when he opened the door, by which we can assume or infer perhaps that they weren't wearing police uniforms, they were just in black and masked. But later he continued to assert that... But if you read his testimony, it seems pretty clear that what he's saying is these were not police, these were people pretending to be police. Isn't that the gist of his testimony? That they were saying, open the door, it's the police, in order to gain entrance. He was not making any claim that he thought this was in fact the police. I don't believe that that's 100% accurate. You want to look at his testimony? Let's look at his testimony. You go ahead. Let's take a look and see what he says. Do you have the page? No, I don't. But what I'm saying is... You have the record with you? Yes, I do, Your Honor. I concede that he said that they weren't police. The question is, what does he mean by that when he says it? Because he does say several other times in his testimony that they were police, and so... Didn't they threaten him? Didn't they tell him not to call the police? They told him not to go tell the police after this, and they told him that the police were involved in the whole scheme. He also was deemed credible, so that issue, I don't know how vital it is to the entire case that we're dealing with, because the immigration judge found that the police... Well, he found that he was credible, and he said the police were involved, and his wife said that the police... His wife, his common-law wife, also said that the police were involved. So the police involvement, I don't think, is a big distraction in the case. You know, you started off with this incident where, you know, they come and you say... But he doesn't think that the police... That's where you started. He doesn't say he thought they were the police. He thought there were police on the other side before he opened the door, but then... Well... He didn't think it was the police afterwards, and he said, don't go to the police. He never says, well, I think these were police disguised in black, you know, out of uniform. He doesn't say that. We don't... He doesn't say very articulately a lot of the details. You can take a different impression of it. I don't think he ever says that this was a ruse to let me in the door. I think other people said that for him, because in several other places, previously when he was talking to immigration officers and in his testimony, he says that they were police. And also, by the way that he expresses himself and the simple ways that he does, it appears... It could very well mean that he said they weren't police because they weren't wearing police uniforms, not the fact that they weren't actually policemen. But in any case, they were in league with the police, and that's accepted on the record. And so, I mean, that's as far as I really can comment on that. In any case... How do we know that they were in league with the police? Well, his wife said that they were in league with the police, and that's what he told the immigration judge and the immigration officers, that don't call the police because we're all part of this together. So, that's where the nexus to the government comes from, is from all these statements that are deemed credible by the immigration judge. And so, to the extent that everyone's bound to the findings of the immigration judge on fact, I would imagine that this court is too, and we don't want to go behind her findings. So, what do you make of the counsel's concession that there was a nexus? Right. So, he gets to the immigration court, and in his asylum application, he doesn't designate a particular social group. And he does that because under the existing case law, when this case comes to court, there's a Mexican case that finds that being afraid to return to your country after coming to the United States is not a particular social group. And then, the case law starts evolving on the social group. And so, when he comes to the BIA, he's able to articulate that this has now emerged as an issue because the adjudicators have to take a case country-specific to figure out whether there's a particular social group with the particularity and the social distinction. And so, he asks the board to now say, in light of these cases like Piribac and MEVG, and other cases in this circuit as well, to either accept now that what happens in Mexico isn't true for Guatemala because we have to look at the country, and MEVG itself is very specific. And so is Piribac saying, just because something's true in Mexico doesn't necessarily mean it's true in Guatemala. And then, he's able to renew or erect an asylum claim at the BIA, which the BIA accepts and then rules on, but again, relies on the 2010 Mexican case. So, this court in several cases has remanded, including Piribac and the board in MEVG, to say, all right, now that we've locked ourselves into this new, in quotes, standard where we have to determine what the situation is in a specific country, and they're specific in saying, again, what might be true in one country is not true in another. Mexico isn't Guatemala. The case should be remanded back to the board at a minimum, and then, of course, to the immigration judge to make a new determination about whether the situation in Mexico is the same in Guatemala or, more specifically, whether a social group exists in Guatemala for people who've been returned from the United States and are thereby perceived to be of the kind. The BIA repudiated Enrique Rivas. Excuse me? The BIA repudiated Enrique Rivas and went with my dissent. I guess that's... Enrique Rivas accepts the MEVG standard, and with the case, the Mexican case was... I think Enrique Rivas proceeded it, and that held that we look at the persecution from the eyes of the persecutor. What's a social group? Yeah, but that... Or a dissent, a vigorous dissent. Yes. I guess the BIA went with the dissent. Which started very strongly in making me think that you didn't think that social groups were really very discernible one from the other, but then felt that, in fact, what the board says about social groups, everybody should be bound to. But that case, again, said in the eyes of the persecutor. However, the board has decided, and this court has also affirmed by accepting the Chevron deference to that decision, that it should be in the eye of the society at large. Now, there's been no evidence that he's been ever allowed to present to any court about... Well, let me ask you this. Whenever somebody claims that something is a social group with no evidence of it at all, does that immediately place a burden on the board to make that determination? For every conceivable social group, you know, red-haired people, handicapped, physically handicapped people, does that, whenever somebody says, this is a social group, does that then require the board to make a determination as to whether that is a social group? Isn't there some need for the petitioner to make a prima facie showing? He does. The trouble in this case is all this new stuff about the country in particular all came about after his case. And so this evolution... I'm sorry. So he didn't make that showing? He did not because he felt... Well, isn't that... Well, he may have a good reason to do it, but nevertheless, he didn't make the showing. Without making a showing, a prima facie showing, how can you blame the board for not then conducting a country-wide inquiry? Well, I'm not blaming the board. I'm just saying the board... Well, you want us to reverse the board, but you didn't make the showing. Your client didn't make the proper showing before the board or before the IJ and then before the board that would have triggered that inquiry. Except that the law changed in the interim. I understand. That's why the lawyer won't get sued for malpractice for failing to do that. But nevertheless... Well, I think the precedent exists. Firstly, the board discussed the case and accepted the asylum. I'm sorry. Which case? In this case, the board didn't say, I'm sorry, you waived your asylum. We're not going to touch it on its appeal. It discussed asylum but went back to the old case. And I can just remind this Court that it itself has remanded many cases in the similar situation. Did your client make a showing under the old standard? Did he? Excuse me? Make a showing, a prima facie showing under the old standard? Under the old standard. Under the pre-MEVG standard. He didn't try because he was bound, he felt, by the law of the case that said Mexicans who return are not a social group. The immigration judge on the board also said Mexicans who return are not a social group. And this concept... I'm sorry. So they adopted his position. So he took a position below which you now repudiate. You say you can't apply Mexican standards to Guatemala. But that was a position your client took below. And why isn't he bound by that? Why wasn't this a kind of claim that you have to raise before the agency and say, no, look, Mexico is Mexico. Guatemala is different. We're going to make a showing as to that. Well, because the law has changed. I think that the board has... So what? Well, it's hard for me to articulate a reply, but it seems to me if you're playing... But you didn't make a showing under either standard. You didn't make a showing under the old standard or the new standard. Well, he couldn't, he didn't, he felt foreclosed because of the Mexican case. Well, people make mistakes all the time, and then they're stuck with them. I mean, there was precedence to Mexico. He was perfectly free to argue Mexico is a different country than Guatemala. I'm going to make that argument. Instead, he foolishly, or perhaps wisely at the time, I don't know, but made the decision, well, they held us as to Mexico. Why aren't you bound by that decision? The decision not to challenge the finding as to Mexico is not applicable to Guatemala. How can you raise it on appeal if you haven't raised the issue before the agency? I think because he was dealing with one set of rules and one binding precedent. But he has to apply some set of rules. So if he says, okay, I'm going to apply the rules that are now in force, right, there was nothing that said you can't make a separate showing as to Guatemala. There was simply something as to Mexico. He accepted that as applicable to Guatemala. Is there something that precluded him from saying Guatemala has a different standard, needs to have a different showing than Mexico? Was there any precedent that said, no, you cannot make that argument? I think the fact that the black letter existed at the time. Why don't you start by answering my question. Was there anything that precluded him? I don't mean that they would have had to overrule. Anything that precluded him from doing that? There's nothing that precluded him from doing that, except the imagination that it might have taken to say there's a certain rubric for how these courts look at these cases, and this issue has been decided, and this would be like attacking windmills. But this court itself has several times remanded, certainly the board itself has. And in MEDG they didn't say, well, you had your chance, and even though there's a new standard, we're not going to remand. Of course, the Third Circuit suggested it as well. But nonetheless, the board remanded. This court has remanded Karabakh, and in my gray brief, I show several nonpublished decisions that the court has remanded. I don't see why Mr. Gervasio shouldn't be giving the same. Well, I don't know what showings those petitioners made before the agency when the case was remanded. I don't know. I don't know what happened. Yeah, exactly. So we don't know. They could very well have raised the argument before the agency, and then they raised it again in court. I don't have any reason to believe they just invented it on appeal. I don't know either. But it seems why would there be so many of these cases in Central America that get remanded because of a new standard, and Mr. Gervasio doesn't get the same opportunity when it's clear that there has been a modification in the standard, or at least how the board looks at these cases. Thank you, counsel. Thank you. May it please the Court, my name is Kate Balaban. I'm here for the government today, and I'm, of course, prepared to answer any questions about the case that you have, including the asylum claim, but I'd like to start with the CAT claim. I thought that would be more important to cover with some thoroughness. The reg provides for protection for applicants under the torture convention when future torture is more likely than not, and numerous factors go into making that determination, including, most importantly, the past torture. And under the applicable regulation, the petitioner bears the burden of proof, and factual findings by the agency must be upheld unless a contrary conclusion is compelled. So to be tortured, there must either be state action or there must be acquiescence by the state. And the most important point I'd like to make today is that this is not a state act or case. We call this the pretend police case. Let me ask you a question about the CAT claim. How do you deal with multinado? In this case, it appears that the board and the IJ put an improper burden of proof on the petitioner. So where does that leave us? So I think you're referring to the relocation issue. Right. So I think we probably don't even get to the relocation issue is the way that we would look at it, but the IJ did reach the issue, and unfortunately we didn't present that issue in our brief. We would be happy to address it in supplemental briefing, but we don't think we need to because we think that the board decision is good based on the holding that there's no state action and there's no showing of acquiescence. Right. So I guess, Gary, your position is there's probably error, but it's harmless? I'm not conceding there's error. I'm wishing that we had briefed it. Then you're here. Do you have an argument to make on the relocation issue? Yes, on the misallocation of burden. Well, I think that the ‑‑ I'm not sure it's relevant because actually the IJ found that on the relocation issue, based on what was in the record, that the family had successfully relocated. You know, I don't think you're quite answering my question. I'm trying to. I know you are. What you're saying is it doesn't matter. What I'm trying to identify is whether or not you agree that the burden was misplaced, in this case in light of Maldonado. If it were, that doesn't necessarily mean you lose, but I'm just trying to get through the threshold question and then you can argue why it doesn't matter. I understand, Your Honor, and I'm hesitant to say that there was error because we mistakenly didn't brief the issue and the board didn't treat the issue. But based on what the IJ found ‑‑ But the IJ did and the board adopted the IJ's opinion. The board adopted the IJ's opinion. Right. So what we should have said in our 28J letter is that both opinions are at play here on the relocation issue. What on the relocation issue? That the IJ's findings on the relocation issue are good. I said what? That they were subsumed by the board's opinion. Because in the last statement, in the last ‑‑ for the foregoing reasons and those articulated by the immigration judge in her decision, we affirm the immigration judge's decision. So I think that our position is that that does subsume the relocation finding. That doesn't then get to your question about whether or not the IJ mistakenly assigned the burden to the applicant in this instance. And I'm not sure it's clear from the IJ's treatment that there was a mistake. The IJ looked at the relocation evidence. Well, I understand that, but it depends on through what lens you look at the evidence and where you place the burden. So that's why I'm asking. So I think that even if you look at it from the standpoint of the government's burden, there was evidence of record that the family successfully relocated. I understand that. I just don't think you've ever answered my first question. About whether or not it's reversible error. No, not reversible error, whether it was error. I haven't conceded. You're right. I haven't conceded that there's error, but I. Well, what's your best argument that it wasn't? That's what I'm trying to get at for the threshold question. If we get beyond that, then you have other points to make. No question. I do have other points I'd very much like to make because I think those are dispositive. Certainly the state action acquiescence issue is important and it's dispositive. Well, isn't there evidence of wholesale police lack of enforcement and corruption in Guatemala? And that was sort of sloughed off in one sentence by the IJ and the BIA. I think that there is mixed country condition evidence, including the State Department reports and the newspaper article. I don't think it was sloughed off. I think that substantial evidence standard applies here and that the agency found that there wasn't enough evidence in either the country condition reports or the newspaper articles to show acquiescence. And I think that that's certainly a supportable finding under the substantial evidence standard. The most important point I'd like to make, though, is that. All that was said was the, here the country background information indicates that while police corruption is a problem, the government continues to prosecute corruption. Right. But that doesn't deal with all the evidence of the extraordinary levels of violence, the fact that the police aren't enforcing, you know, essentially are not enforcing the law, and that kidnappings are a problem both in rural parts of the country as well as in Guatemala City. And that's all that's said about it is here the country background information indicates that while police corruption is a problem, the government continues to prosecute it. Is that a sufficiently adequate way to address the evidence? Well, I'm not sure, Your Honor, what the agency could have done in addition. Well, they could have discussed the evidence and said why it didn't justify their holding. But the bottom line is that the State Department reports, as is usually the case, are mixed. And while there might be some evidence of corruption, there's also some evidence of prosecution. So I think that where there is mixed evidence like this, I mean, there have been cases where the court has said that, like, for instance, in Madrigal, that there has been a showing of possible that acquiescence, you could show acquiescence. But in that case, there was specifically in the facts, in the underlying facts, some sort of association, some allegation that there was a status of the applicant that related to the corruption. These were former military officers. In this case, we don't have this. This applicant doesn't have any sort of special or particular status that would make this more of a case that more likely where there would be corruption. So I think that the bottom line is he hasn't shown state action and he hasn't shown acquiescence. He hasn't met that burden of proof. And without that, he can't succeed without regard to the relocation point. Do you want to talk about asylum? Asylum? I'd be happy to talk about asylum. We think that on the particular social group, there are cases that I can provide to this court afterwards. There's an unreported case from 2010 where returning Guatemalans from the United States who were perceived to – there was an allegation that that was a particular – a valid, cognizable particular social group, and the court said, no, it wasn't. And there's a board case on wealthy Guatemalans. Unreported case from where? From the Ninth Circuit, 404-F-APPX-225. Why are you citing unpublished decisions? Because that's what I have. I can also give you a board case. Would you like the board case 24-INN-December? These are things that you didn't put in your brief? We didn't. These are authorities you didn't put in your brief? We relied on Delgado, which we still believe is good law. I'm sorry, but is that what you were citing? Yes. We cited in our brief Delgado, correct. The one you just said, 244? Oh, no. That was – I'm sorry. That is a board case relating specifically to wealthy Guatemalans. And that's not cited in your brief? It's not. We can provide – Why not? We just – Why not? I think we rested on the very broad proposition that – It's not that you didn't know about it? Did you not know about it? Is this a very recent case? Like, did it happen last week? No, it's not a recent case, and I apologize, Your Honor. I didn't write the brief, but I would be happy to supplement the brief. If you were going to raise the oral argument, did you provide a copy to opposing counsel so he could address it? No, I wouldn't. I didn't, but I will. Did you send him an email telling – But it's a little late. I think that – Did you send him an email? When did you realize this case existed? Last night, Your Honor. Okay, did you send him an email this morning with a copy of the case so he could at least look at the before oral argument? No, I did not. Why didn't you do that? I should have, Your Honor. But why didn't you? I just got an email from colleagues saying that we should rely generally on Delgado. But you were going to come into court and raise something that you didn't – Did you provide opposing counsel a copy on notice, even late notice, so he could have a fighting chance to consider it? I apologize, Your Honor. Is that a fact? I certainly wasn't meaning – Is that a fact? No, I certainly wasn't meaning to – Okay, I would like you to talk to your supervisor and have your supervisor see a copy of this video. I will. No, you didn't listen to me when I said. Okay? Yes. And I would like to have your supervisor send us a note explaining whether this is a proof practice in the Justice Department. Do you understand? I do, Your Honor. After having viewed the video. This is wholly unprofessional. How do you expect opposing counsel to address something like this? It should have been in your brief. Agreed, Your Honor. But before you open your mouth in court and raise something like this, did you bring a copy to give opposing counsel? I didn't, Your Honor. I don't have a copy myself, Your Honor. I was just prepared to answer the court's questions if it came up. I apologize that I hadn't volunteered it. I apologize that I did volunteer it. Show it to your supervisor. I will. And we'd like to hear from – Okay. Thank you. Thank you, counsel. Thank you. We can give you two minutes to rebuttal if you want. I don't really have much to say on rebuttal, except that I can help the court by pointing out that in the reply brief, I do address on a few pages this exact issue we started out with as to what Mr. Gervasio said about who it was that attacked him. And the citations are to the record to show that he maintained in his testimony before the immigration judge that he walked in the door and he thought they were police. And in his way of articulating things, it very well could be – I can't overly read his mind, but he said they didn't look like police when he opened the door, even though they said they were police. But he continued to assert while they were in the house that they said that they were the police. And there's a state actor there, and then his wife also said that they told him that they were in cahoots with the police, don't bother to go to the police, so we have more state action. And as far as that goes – Why is it state action if people claim to be part of the police? I mean, you know, this is what hoodlums would say. What reason is there to believe that they are telling the truth and not just saying this in order to scare them or keep them from reporting to the police? Well, the trouble that we face in a case like this is if they don't do like a dragnet and show their badge to people, then we'll never know and we wouldn't even know if it was a fake badge. Right, but you have to show nexus. I mean, it just can't be pretend nexus. It seems to me your best argument is that the police were unable to control the group or else were in cooperation with the group in actuality. I know that's part of your argument, but I don't – because somebody identifies themselves as a state actor, doesn't make a mistake as a state actor for the purposes of the immigration law. When you're dealing with a society that you have the evidence that you have, and I think this court has said several times that the persecutor doesn't necessarily lay out their nexus and their identity and all these things in a neat little package for these cases. But you have to have some evidence. You have to have some evidence external to what people say. Newspaper reports, state country conditions reports, you have to have some evidence. Well, we have evidence about the situation in Guatemala with the police. This question is what kind of specific evidence can we have that went on in this man's little house in the back in rural Guatemala? We have what he said and we have what his wife said. That's hearsay, but it's acceptable, and the judge accepted it as true. So if she accepted it as true. Well, accepted that what your client said was true doesn't mean that what she was told by these people is true. That's right. That's right. But, again, we're stuck with how the police behave and what goes on there. In any case, I think the court also has the letter that says that when you're dealing with the police, the fact that the board has said that if the police are ineffective, that's one thing, but if it's a rogue policeman and these gentlemen, assuming they were police, were rogue policemen, then they're still state actors for purposes of CAT. Thank you, counsel. Thank you.
judges: Kozinski, Thomas, Korman